**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| BMO BANK N.A., a national banking association, as Administrative Agent, | No. _____ |
| Plaintiff, | |
| v. | |
| SAILORMEN, INC., a Florida corporation, | |
| Defendant. | |

## COMPLAINT

BMO Bank N.A., formerly known as BMO Harris Bank N.A. (in its individual capacity, "BMO"), as administrative agent (in such capacity, as successor and assign of BBVA USA, formerly known as Compass Bank, the "Agent") to the lenders (collectively, the "Lenders," and together with the Agent, the "Lender Parties") from time to time party to that certain *Sixth Amended and Restated Credit Agreement*, dated as of September 3, 2020 (as amended, restated, extended, supplemented, or otherwise modified from time to time, the "Credit Agreement"), hereby complains against Sailormen, Inc. ("Sailormen" or "Defendant") and alleges:

## Nature of the Action

1.      This is an action for appointment of a receiver, breach of contract and possession of collateral arising from Defendant's failure to comply with various obligations imposed by the Credit Agreement, pursuant to which the Lenders originally committed to lend Defendant, on a secured basis, loans in the aggregate amount of $113,500,000, of which at least $112,363,525.64 in principal remains unpaid as of the date hereof.

2.      The Lender Parties and Defendant—an owner and operator of certain restaurant franchises—are parties to the Credit Agreement. Defendant and Agent (as successor and assign of

BBVA USA, formerly known as Compass Bank) are parties to that certain *Security Agreement*, dated March 27, 2014 (as amended, restated, extended, supplemented, or otherwise modified from time to time, the "Security Agreement"). The Credit Agreement, the Security Agreement and any and all other documents executed in connection therewith are collectively referred to herein as the "Loan Documents." Except as otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Credit Agreement.

3.      After many months of negotiations, Agent and Defendant are at a critical impasse regarding funding of Defendant's operations and repayment of the Obligations. Agent has repeatedly requested that Defendant focus on monetizing certain of its assets to repay some of the Loans and other obligations owed to the Lender Parties. Indeed, as discussed herein, Defendant's efforts to sell its restaurants in the Jacksonville Market (as defined herein) recently failed, exacerbating the Lenders' exposure.

4.      Defendant continues to insist on operating as if it is completely free of any obligations to the Lender Parties and has failed to monetize its assets to reduce its massive outstanding indebtedness due to the Lender Parties. Moreover, Defendant is unable to make the required capital investments under its franchise agreements for this year and likely next.

5.      Agent commences this action against Defendant to exercise its rights, on behalf of the Lenders, as specifically provided under the Credit Agreement and Security Agreement. Agent asserts the following claims for relief: (a) the appointment of a receiver over Defendant and its assets; (b) breach of contract and compensatory damages in an amount not less than $129,982,639 (as of November 28, 2025), including interest, accruing expenses, fees and costs, including, but not limited to, attorney's fees and costs, which continue to accrue as of the date hereof, against

Defendant; and (c) possession of the Collateral (as defined herein) pursuant to section 9-609 of the Uniform Commercial Code, N.Y. U.C.C. Law § 9-609.

## Parties

6.      BMO is a national banking association. It is designated to have its main office in Chicago, Illinois. Therefore, BMO is, pursuant to 28 U.S.C. § 1348, a citizen of the State of Illinois.

7.      BMO is the administrative agent for the Lenders and, in such capacity, is vested with the exclusive right to enforce the Credit Agreement on behalf of the Lenders.

8.      Sailormen is a corporation organized under the laws of the State of Florida with its principal place of business, i.e., where its officers direct and control Sailormen's activities, in Miami, Florida. Therefore, Sailormen is a citizen of the State of Florida.

9.      Defendant is in the business of owning and operating restaurants specializing in the preparation, merchandising, advertising and sale of "Louisiana" style menu items that include spicy chicken, biscuits, fried shrimp and other seafood, red beans and rice and other quick-service menu items pursuant to franchise agreements with Popeyes Louisiana Kitchen, Inc. (the "Franchisor"). Defendant employs over 4,000 people, including restaurant staff, management, and other white collar and administrative professionals.

## Jurisdiction and Venue

10.      This Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) because Agent and Sailormen are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

11.      This Court has personal jurisdiction over Defendant because, pursuant to Section 10.14(b) of the Credit Agreement, Defendant (i) "IRREVOCABLY AND UNCONDITIONALLY" submitted to jurisdiction of in this Court regarding any action "IN ANY WAY RELATING TO [THE CREDIT AGREEMENT] OR ANY OTHER LOAN DOCUMENT

OR THE TRANSACTIONS," and (ii) agreed that "ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT."

12.     Venue is proper in this district because Defendant irrevocably and unconditionally consented to venue here in Section 10.14(c) of the Credit Agreement, where Defendant irrevocably and unconditionally waived, to the fullest extent permitted by law, "ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION."

**Background**

## I.     The Loans

13.     On or about September 3, 2020, Defendant, the Lenders and BBVA USA, formerly known as Compass Bank, as administrative agent (in such capacity, the "Predecessor Agent"), entered into the Credit Agreement. A true and correct copy of the Credit Agreement is attached as **Exhibit 1**.

14.     The Credit Agreement originally provided Defendant with (a) term loans in the aggregate amount of $101,500,000.00 (the "Term Loans"), (b) a revolving line of credit in the aggregate amount of $4,000,000.00 (the "Revolving Loans") and (c) a development line of credit in the aggregate amount of $8,000,000.00 (the "Development Loans," and together with the Term

Loans, the Revolving Loans and other loans extended by the Lender Parties to Defendant from time to time pursuant to the Credit Agreement, the "Loans").[1] (Ex. 1, Article II.)

15.     On or about March 31, 2021, Defendant, the Predecessor Agent and the Lenders entered into that certain *First Amendment to Sixth Amended and Restated Credit Agreement* (the "First Amendment"), pursuant to which, among other things, new term loans (called "Term II Loans") were extended, and the Development Loan Commitment and Revolving Loan Commitment were each increased.

16.     On or about May 13, 2021, Defendant, the Predecessor Agent and the Lenders entered into that certain *Second Amendment to Sixth Amended and Restated Credit Agreement* (the "Second Amendment"), pursuant to which, among other things, the parties amended certain definitions, representations and warranties and conditions to effectiveness.

17.     On or about September 3, 2021, Defendant, the Predecessor Agent, BMO and the Lenders entered into that certain *Agency Transfer Agreement* (the "Agency Transfer Agreement"), pursuant to which, among other things, the Predecessor Agent retired as agent, and the Lenders appointed BMO as Agent in accordance with Section 9.06 of the Credit Agreement. A true and correct copy of the Agency Transfer Agreement is attached as **Exhibit 2**.

18.     On or about September 3, 2021, Defendant and the Lender Parties entered into that certain *Third Amendment to Sixth Amended and Restated Credit Agreement* (the "Third Amendment"), pursuant to which, among other things, the Credit Agreement was amended to effect BMO's succession as Agent.

---

[1] The Term Loans provided under the Credit Agreement refinanced certain indebtedness in an aggregate amount outstanding as of the date thereof of $65,799,999.96, which Defendant incurred under that certain *Credit Agreement*, dated March 27, 2014 (the "Original Credit Agreement"), by and between Defendant, the Predecessor Agent and the Lenders. (Ex. 1, p. 1.)

19.     On or about April 18, 2022, Defendant and the Lender Parties entered into that certain *Fourth Amendment to Sixth Amended and Restated Credit Agreement* (the "<u>Fourth Amendment</u>"), pursuant to which, among other things, interest rates based on LIBOR were transitioned to SOFR, and certain other provisions of the Credit Agreement were amended. Pursuant to the Fourth Amendment, Term Loans in the amount of $91,984,375, Development Loans in the amount of $7,765,306, and Term II Loans in the amount of $9,975,000 were repaid in full and new term loans in the aggregate amount of $109,724,681 were issued, along with $5,000,000 of Revolving Loan Commitments and $25,000,000 of Development Loan Commitments.

20.     On or about December 2, 2022, Defendant and the Lender Parties entered into that certain *Fifth Amendment to Sixth Amended and Restated Credit Agreement* (the "<u>Fifth Amendment</u>"), pursuant to which, among other things, the Lender Parties waived certain Events of Default which occurred under Section 8.01(b) of the Credit Agreement as a result of Defendant's failure to comply with the financial covenants contained in Sections 7.11(b) and (c) of the Credit Agreement for the third Fiscal Quarter of the 2022 Fiscal Year.

21.     On or about March 22, 2023, Defendant and the Lender Parties entered into that certain *Sixth Amendment to Sixth Amended and Restated Credit Agreement* (the "<u>Sixth Amendment</u>"), pursuant to which, among other things, the Lender Parties waived certain Events of Default which occurred under Section 8.01(b) of the Credit Agreement as a result of Defendant's failure to comply with the financial covenants contained in Sections 7.11(a), (b) and (c) of the Credit Agreement for the fourth Fiscal Quarter of the 2022 Fiscal Year.

22.     On or about March 15, 2024, Defendant and the Lender Parties entered into that certain *Seventh Amendment to Sixth Amended and Restated Credit Agreement* (the "<u>Seventh</u>

Amendment"), pursuant to which, among other things, the Lender Parties waived certain Events of Default which occurred under: (a) Section 8.01(a)(i) of the Credit Agreement as a result of Defendant's failure to comply with payment requirements contained in Sections 2.09(c) and (e) of the Credit Agreement for principal payments due on December 1, 2023, January 2, 2024, February 1, 2024 and March 1, 2024; (b) Section 8.01(a)(ii) of the Credit Agreement as a result of Defendant's failure to comply with (i) Section 2.10(c) of the Credit Agreement for the interest payment due on November 20, 2023, February 2, 2024 and February 12, 2024 and (ii) Section 2.11(b) of the Credit Agreement for fees due on January 2, 2024; and (c) Section 8.01(b) of the Credit Agreement as a result of Defendant's failure to comply with (i) Sections 6.02(a) and 7.11(d) of the Credit Agreement, in each case, for the Fiscal Quarter ended December 31, 2023 and (ii) Section 6.03 of the Credit Agreement with respect to providing notice in accordance therewith of the aforementioned Events of Default. A true and correct copy of the Seventh Amendment is attached as **Exhibit 3**.

## II.     Collateral for the Loans

23.     On or about March 27, 2014, Defendant and the Predecessor Agent entered into the Security Agreement. A true and correct copy of the Security Agreement is attached as **Exhibit 4**.

24.     As security for payment of all obligations Defendant owed under the Credit Agreement, Defendant assigned and granted to Agent, for itself and the ratable benefit of the Lenders (and to the extent provided therein, their affiliates), a continuing security interest and lien in and to all of Defendant's right, title, and interest in and to substantially all of Defendant's then-existing and after-acquired property, consisting of: (a) all of its personal property, including, without limitation, its Inventory, Accounts, Equipment, Licenses, Contracts, Leases, Other Contracts, Intangibles (including books and records), Furniture and Fixtures, Miscellaneous Items

and Cash, and (b) all Proceeds and products of any of the foregoing (collectively, the "Collateral"). (Ex. 4, pp. 1-3.)

25.    The Security Agreement and the Security Interest granted therein secure payment and performance of all of the obligations of Defendant to the Lender Parties, as secured parties, under the Security Agreement, the Credit Agreement and all of the other Loan Documents. (*Id.* at 3.)

26.    Agent, on behalf of the Lenders, has properly perfected its security interests in and to the Collateral in the manner required by applicable law. With respect to Agent's cash Collateral held in deposit accounts, Agent has properly perfected its security interest by entering into certain deposit account control agreements with Defendant. As a consequence of the Security Agreement and Agent's perfection of its security interests in the Collateral in the manner required by applicable law, Agent has a fully perfected first-priority security interest in substantially all of Defendant's assets (collectively, the "Collateral Liens").

**III.    Events of Default and their effect**

27.    Section 8.01 of the Credit Agreement identifies "Events of Default." (Ex. 1, § 8.01.) An Event of Default occurs when, among other things:

> (a)    Defendant fails to pay any amount of principal of any Loan when due (Ex. 1, § 8.01(a).);
>
> (b)    Defendant fails to pay any interest on any Loan or any fee due under the Credit Agreement within three business days of the same becoming due (*id.*);
>
> (c)    Defendant fails to pay any other amount payable under the Credit Agreement or any other Loan Document within five days of the same becoming due (*id.*); or
>
> (d)    Defendant fails to perform or observe any term, covenant, or agreement contained in, among other provisions, Article VII of the Credit Agreement (Ex. 1, § 8.01(b).).

28.     Upon the occurrence of these types of Events of Default, Agent: (a) may declare the Commitments to be terminated in whole or in part; (b) may declare unpaid amounts outstanding for all of the Loans immediately due and payable; and (c) may exercise, on behalf of itself and the Lenders, all rights and remedies available to it or the Lenders under the Loan Documents. (Ex. 1, § 8.02.)

29.     Additionally, upon the occurrence and during the continuation of an Event of Default, the Security Agreement vested Agent with all the rights, powers and privileges of a secured party under the Uniform Commercial Code and all other rights and remedies available to Agent at law or in equity. (Ex. 4, § 11.)

30.     The Security Agreement further vested Agent with the right to appoint a receiver over the property and assets of Defendant, and Defendant consented to such appointment and waived (a) any objection it may have to the appointment of a receiver and (b) the right to have a bond or other security posted by Agent or any other Person in connection with the appointment of a receiver. (Ex. 4, § 11.)

31.     Defendant also irrevocably constituted and appointed Agent as its attorney-in-fact, with power of substitution and with authority, upon the occurrence of an Event of Default, to take action, execute documents, perform work and generally perform other acts in the name of Defendant that Agent deems appropriate to exercise the rights and remedies granted to it under the Security Agreement, the Credit Agreement and the other Loan Documents. (Ex. 4, § 12.)

32.     The Security Agreement further states that all reasonable out-of-pocket costs or expenses that Agent incurs in connection with its rights under the Security Agreement are included in the Obligations and bear interest at the Default Rate. (Ex. 4, § 12.)

**IV.    Defendant's defaults under the Credit Agreement**

33.    Defendant has caused several Events of Default to occur, many of which are continuing as of the date hereof.

34.    First, an Event of Default has occurred and is continuing pursuant to Section 8.01(a) of the Credit Agreement as a result of Defendant's breach of Section 2.10(f) of the Credit Agreement, which requires that Defendant pay to Agent, for the ratable benefit of the applicable Lenders, $597,425.51, which amount represents 25% of the missed interest payment previously due on November 20, 2023. (Ex. 3, Ex. A – Amended Credit Agreement, § 2.10(f).)

35.    Second, Events of Default have occurred and are continuing pursuant to Section 8.01(a) of the Credit Agreement as a result of Defendant's breach of Section 2.10(c) of the Credit Agreement by failing to pay the interest on the Loans due November 20, 2024, February 3, 2025, February 13, 2025, February 20, 2025, May 1, 2025, May 13, 2025, May 20, 2025, August 1, 2025, August 13, 2025, August 22, 2025, November 3, 2025 and November 13, 2025 and November 28, 2025. (Ex. 1, § 2.10(c).)

36.    Third, Events of Default have occurred and are continuing pursuant to Section 8.01(a) of the Credit Agreement as a result of Defendant's breach of Section 2.09(c) of the Credit Agreement by failing to pay the principal amounts of the 2022 Refinancing Term Loan due December 2, 2024, January 2, 2025, February 3, 2025, March 3, 2025, April 1, 2025, May 1, 2025, June 2, 2025, July 1, 2025, August 1, 2025, September 1, 2025, October 1, 2025 and November 3, 2025. (Ex. 3, Ex. A – Amended Credit Agreement, § 2.09(c).)

37.    Fourth, Events of Default have occurred and are continuing pursuant to Section 8.01(a) of the Credit Agreement as a result of Defendant's breach of Section 2.09(e) of the Credit Agreement by failing to pay the principal amounts of the Development Term Loan due December 2, 2024, January 2, 2025, February 3, 2025, March 3, 2025, April 1, 2025, May 1, 2025, June 2,

2025, July 1, 2025, August 1, 2025, September 1, 2025, October 1, 2025 and November 3, 2025. (Ex. 3, Ex. A – Amended Credit Agreement, § 2.09(e).)

38.    <u>Fifth</u>, Events of Default have occurred and are continuing pursuant to Section 8.01(b) of the Credit Agreement as a result of Defendant's breach of Section 7.11(d) of the Credit Agreement by failing to maintain Corporate EBITDA greater than the applicable threshold for the applicable Fiscal Period for 12th and 13th Fiscal Periods of the 2024 Fiscal Year and the 1st, 2nd, 3rd, 4th, 5th and 6th Fiscal Periods of the 2025 Fiscal Year. (Ex. 3, Ex. A – Amended Credit Agreement, § 7.11(d).)

39.    <u>Sixth</u>, Events of Default have occurred and are continuing pursuant to Section 8.01(b) of the Credit Agreement as a result of Defendant's breach of Section 7.11(e) of the Credit Agreement by failing to meet minimum liquidity requirements for the applicable Fiscal Period for 10th, 11th, 12th and 13th Fiscal Periods of the 2024 Fiscal Year and the 1st, 2nd, 4th, 5th and 6th Fiscal Periods of the 2025 Fiscal Year. (Ex. 3, Ex. A – Amended Credit Agreement, § 7.11(e).)

40.    <u>Seventh</u>, an Event of Default has occurred and is continuing pursuant to Section 8.01(a) of the Credit Agreement as a result of Defendant's breach of Sections 10.04(a) and (e) of the Credit Agreement by failing to pay all out-of-pocket expenses incurred by Agent in accordance with the Credit Agreement since April 23, 2025, in an aggregate amount of at least $3,022,541 as of November 28, 2025. (Ex. 3, Ex. A – Amended Credit Agreement, §§ 10.04(a), (e).)

41.    The Events of Default listed above have been long outstanding, and Defendant is unable or unwilling to resolve them.

## V.    Declarations of default under the Credit Agreement

42.    As a consequence of the then-existing Events of Default under the Credit Agreement, Agent issued certain notices of default and reservation of rights letters to Defendant (collectively, the "Default Notices"):[2]

(a)    the *Reservation of Rights Letter* dated November 28, 2023 (the "First Default Notice"), a true and correct copy of which is attached as **Exhibit 5**;

(b)    the *Reservation of Rights Letter* dated January 18, 2024 (the "Second Default Notice"), a true and correct copy of which is attached as **Exhibit 6**;

(c)    the *Reservation of Rights Letter* dated February 7, 2024 (the "Third Default Notice"), a true and correct copy of which is attached as **Exhibit 7**;

(d)    the *Reservation of Rights Letter* dated November 26, 2024 (the "Fourth Default Notice"), a true and correct copy of which is attached as **Exhibit 8**;

(e)    the *Reservation of Rights Letter* dated December 18, 2024 (the "Fifth Default Notice"), a true and correct copy of which is attached as **Exhibit 9**;

(f)    the *Reservation of Rights Letter* dated February 3, 2025 (the "Sixth Default Notice"), a true and correct copy of which is attached as **Exhibit 10**; and

(g)    the *Reservation of Rights Letter* dated August 8, 2025 (the "Seventh Default Notice"), a true and correct copy of which is attached as **Exhibit 11**.

43.    Defendant has failed to comply with the Default Notices and the Credit Agreement by, among other things, not paying all amounts due and owing to the Lenders under the Loan Documents.

44.    Defendant has not objected to any of the Default Notices.

---

[2] As part of the Seventh Amendment, the Lender Parties waived the Designated Defaults set forth in the First Default Notice, the Second Default Notice, and the Third Default Notice.

**VI.    Defendant's failure to resolve the Events of Default**

45.    Since September 2024, the Lender Parties and their professional advisors have engaged in regular discussions with Defendant, its representatives and CapitalSpring ("CapitalSpring"), Defendant's controlling shareholder and equity sponsor, in an effort to resolve or otherwise address the ongoing Events of Default. Defendant has repeatedly failed to make principal and interest payments and has not made any principal or interest payments on the Loans since November 2024.

46.    From September 2024 until January 2025, the Lender Parties attempted to reach a negotiated agreement with Defendant and CapitalSpring, whereby CapitalSpring would make an equity investment, and the terms of the Credit Agreement would be amended to resolve then-ongoing Events of Default, address Defendant's liquidity issues and provide for payment of principal and interest. Despite the Lender Parties' good-faith efforts to reach agreement, CapitalSpring abruptly changed course in January 2025, advising that it was unwilling to reach an agreement.

47.    In January 2025, Defendant engaged Capital Insight ("Capital Insight"), a boutique investment bank and advisory firm, to assist it with evaluating and implementing strategic and tactical options as part of a restructuring process for Defendant.

48.    Similarly, in early February 2025, Agent's counsel engaged G2 Capital Advisors, LLC ("G2") to work collaboratively with Defendant, its representatives and CapitalSpring to assist the Lender Parties with evaluating and implementing strategic and tactical options as part of a restructuring process for Defendant.

49.    From February 2025 until June 2025, the Lender Parties again attempted to negotiate terms of a comprehensive capital-structure restructuring with Defendant and CapitalSpring, which led to an agreement in principle among the parties, subject to very few

discreet open issues bounded by specific bids and asks. Shortly after reaching this agreement-in-principle, the Lender Parties and Defendant jointly presented it to the Franchisor. Less than ten days after the meeting, on or about June 19, 2025, Defendant's representatives again informed the Lender Parties that Defendant and CapitalSpring were unwilling to proceed with the negotiated restructuring because Defendant's revised financial forecasts would not support an agreement from Defendant's and CapitalSpring's perspective.

50.    Defendant, with support from the Lender Parties, directed Capital Insight to act as investment banker and market certain assets located in and around Jacksonville, Florida (the "Jacksonville Market") and provide other financial advisory, consulting and administrative services to Defendant related to the Jacksonville Market sale. Capital Insight received only one offer for the Jacksonville Market assets after contacting 24 potential buyers and soliciting letters of intent, which CapitalSpring and Defendant rejected.

51.    Further, a CapitalSpring principal recently told one of Agent's representatives that CapitalSpring's investment committee was unlikely to commit additional capital to Defendant because its original equity investment was already behind the Lender Parties' secured position. Agent understands CapitalSpring's equity investment in Defendant to be in excess of $100 million.

52.    To date, Defendant, its representatives and CapitalSpring have been unwilling or unable to consummate any solution presented after many months, despite the Lender Parties' continued attempts to negotiate in good faith.

## VII.    Defendant is insolvent

53.    Defendant is in the business of operating Popeyes Louisiana Kitchen restaurants pursuant to franchise agreements with the Franchisor. While Defendant has other assets, including its restaurant spaces and equipment, Defendant's continuing ability to monetize its assets depends on its ability to perform under its franchise agreements.

54.     Defendant's liabilities exceed the orderly liquidation value of its assets by tens of millions of dollars.

55.     Defendant has demonstrated that it is no longer able to generate sufficient cash flow to fund its operating expenses, while also servicing its Loans and other obligations under the Loan Documents. Defendant's obligations each payroll cycle regularly top $2,500,000, while its cash balance recently dipped below $420,000, which is nowhere near enough to sustainably meet Defendant's operating expenses while also servicing its Loans and other Loan Document obligations. Cash balances as low as $420,000 put Defendant at significant risk of running out of money with no prospect for additional funding, if collections stall or cash need increase due to unforeseen business needs.

56.     Further, Defendant has failed to meet its own budgetary forecasts, and its financial performance in 2025 has deteriorated compared to 2024. As of September 2025, Defendant's net sales for the prior thirteen periods totaled approximately $228,500,000, compared to $239,300,000 for the thirteen periods through September 2024, a decrease of approximately 4.5 percent. In spite of this revenue decline, Defendant's costs have remained relatively flat, and Defendant's consolidated adjusted EBITDA for the thirteen periods through September 2025 is approximately 13.2 percent below Defendant's March 2025 budgeted amount for the same period. At the same time, Defendant's corporate selling, general and administrative expenses remain approximately 20.2 percent higher than its March 2025 budget.

57.     If Defendant were to begin paying principal and interest to the Lenders or even simply reimbursing the Agent for its professional fees and costs as required under the Credit Agreement, it would have literally no cash left for operations—including payroll. As stated above,

Defendant has made no payments on its Loans since November 2024 and has instead used its cash to pay subordinate, unsecured obligations.

58.    Defendant has deferred rent payments to multiple landlords, which puts it in danger of defaulting under the applicable leases. The Franchisor may terminate the franchise agreements if Defendant is evicted from, or otherwise loses the right to possess, the premises of any one franchised restaurant, putting Defendant in further jeopardy with the Franchisor.

59.    On April 10, 2025, Brett Bishov, Managing Partner of Capital Insight and representative of the Defendant, sent a text message to Heidi Piché, a managing director of G2, admitting that "[Defendant's] business isn't worth anywhere near par," meaning the par value of the Lenders' Loans.

60.    More recently, in September 2025, Defendant's chief financial officer, Christine Borrack, advised Agent that Defendant would be unable to pay Lenders' professional fees for the remainder of the year, given the company's low cash balance.

61.    During discussions regarding a proposed plan for Defendant's business in October 2025, Mr. Bishov admitted to Ms. Piché that he did not know how to address Defendant's myriad issues because Defendant's business is "failing."

62.    Because Defendant is insolvent, CapitalSpring is completely "out of the money," meaning the value of its equity investment in Defendant is worthless.

## Count I
### Appointment of Receiver

63.    Agent restates and realleges the allegations in paragraphs 1-62.

64.    Defendant is in default under the Loan Documents and is presently indebted to the Lenders in an amount in excess of $126,960,098 as of November 28, 2025.

65.     Upon the occurrence and during the continuation of an Event of Default under the Credit Agreement, the Security Agreement states that Agent has "the right to the appointment of a receiver for the properties and assets of the [Defendant]," and that Defendant "consents to such appointment and…waives any objection it might have thereto[.]" (Ex. 4, § 11.) Defendant has, therefore, contractually consented to the appointment of a receiver over it and its assets by a court of competent jurisdiction and prospectively waived any arguments in opposition to such appointment that it otherwise might have had.

66.     Upon the occurrence and during the continuation of an Event of Default under the Credit Agreement, Defendant consented in the Security Agreement to Agent's exercise of any right and remedy available to Agent "at law or in equity." (Ex. 4, § 11.) That consent necessarily includes the appointment of a receiver under a federal court's equitable powers as recognized by Federal law. Fed. R. Civ. P. 66. Defendant has, therefore, consented to the appointment of a receiver under the equitable powers of a federal court exercising diversity jurisdiction.

67.     Agent, on behalf of the Lenders, has a clear right to the property in possession of Defendant, namely the Collateral, which Agent has encumbered by the Collateral Liens, which constitute substantially all of Defendant's assets.

68.     The Collateral is in danger of loss because Defendant is insolvent in that the sum of its debts is greater than the value of its property, at a fair valuation, because even if Defendant's assets were sold today, the amount Defendant would recover would fall far short of the amount needed to pay the Obligations, without regard to accrued and accruing interest, fees and other costs due to the Lender Parties. Defendant also has insufficient cash flow to pay its operating expenses while also making payments on its Loans, its other obligations to the Lender Parties and its obligations to the Franchisor under the franchise agreements.

69.     The Agent therefore requests that the Court appoint a receiver over Defendant and its assets, and vest the receiver with full power over Defendant's property and assets.[3]

### Count II
### Breach of Contract

70.     Agent restates and realleges the allegations in paragraphs 1-62.

71.     Defendant entered into the Credit Agreement with the Lender Parties, which constitutes a valid and binding contract, supported by consideration. (*See* Ex. 1.)

72.     Defendant breached the Credit Agreement by, as more specifically alleged in paragraphs 33 to 41, causing or allowing the Events of Default to occur, and to remain continuing, including, without limitation: (a) failing to make payments to the Lender Parties when due; and (b) failing to meet certain required financial covenants.

73.     The Lender Parties have performed all of their respective obligations under the Credit Agreement.

74.     Under the Credit Agreement, the total outstanding amount of principal, interest, expenses, fees and costs, including, but not limited to, attorney's fees and costs, due and owing to the Lenders as of November 28, 2025 exceeds $129,982,639, and interest, expenses, fees and costs continue to accrue.

75.     The Lender Parties have been damaged in an amount not less than $129,982,639, which includes interest, expenses, fees and costs, including, but not limited to, attorney's fees and costs, which continue to accrue, by Defendant's numerous breaches of the Credit Agreement.

76.     Moreover, under the Credit Agreement, the Lender Parties are entitled to recover all reasonable out-of-pocket costs and expenses (including attorney's fees) incurred by Agent and

---

[3] Concurrently herewith, the Agent is filing a motion to appoint a receiver over Defendant and its assets.

each Lender, in connection with the collection of Defendant's obligations or the enforcement of the Credit Agreement. (Ex. 1, § 10.04(a).)

### Count III
### Possession of the Collateral – N.Y. U.C.C. Law § 9-609

77.     Agent restates and realleges the allegations in paragraphs 1-62.

78.     Each Lender is a "secured party" within the meaning of N.Y. U.C.C. Law § 9-102(a)(73), the Security Agreement is a "security agreement" within the meaning of N.Y. U.C.C. Law § 9-102(a)(74) and the Collateral is "collateral" within the meaning of N.Y. U.C.C. Law § 9-102(a)(12).

79.     N.Y. U.C.C. Law § 9-609(a) and (b) provide that, after default, a secured party may take possession of collateral pursuant to judicial process.

80.     Upon information and belief, Defendant has possession, custody and control over the Collateral.

81.     As alleged above in paragraphs 33 to 41, Defendant is in default under the Credit Agreement.

**WHEREFORE**, Agent, on behalf of the Lenders, respectfully requests that this Court:

(a)     Enter an order appointing a receiver over Defendant and its assets, and vesting the receiver with full power over Defendant's property and assets.

(b)     Enter judgment in its favor:

(1)     Adjudging Defendant to be in breach of the Credit Agreement;

(2)     Awarding compensatory damages against Defendant in an amount to be determined at trial, but no less than $126,960,098 (as of November 28, 2025), plus accruing interest, and accrued and accruing expenses, fees, and costs;

(3)    Awarding the Lender Parties their reasonable fees and costs under section 10.04(a) of the Credit Agreement, which total not less than $3,022,541 through November 28, 2025, and continue to accrue;

(4)    Directing Defendant, pursuant to Section 14 of the Security Agreement and N.Y. U.C.C. Law § 9-609, to assemble and deliver, at Defendant's expense, possession of the Collateral to Agent at a convenient place or places acceptable to Agent; and

(5)    Granting such other and further relief as the Court deems just and proper.

Dated: December 8, 2025                Respectfully Submitted,

By: */s/ Gabriel Hertzberg*        

Gabriel Hertzberg
Nathaniel Ament-Stone
**KATTEN MUCHIN ROSENMAN LLP**
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8556
gabe.hertzberg@katten.com
nathaniel.ament-stone@katten.com

- and -

Peter P. Knight (IL 6270084)
    (*pro hac vice* forthcoming)
Terence G. Banich (IL 6269359)
    (*pro hac vice* forthcoming)
Paul T. Musser (IL 6304946)
    (*pro hac vice* motion to be filed)
Alexander L. Norman (IL 6349760)
    (*pro hac vice* motion to be filed)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Fax: (312) 902-1061
peter.knight@katten.com
terence.banich@katten.com
paul.musser@katten.com
alex.norman@katten.com

*Counsel for Plaintiff BMO Bank N.A., as Agent*