UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BMO BANK N.A., a national banking association, as Administrative Agent,<br><br>    Plaintiff,<br> v.<br><br>SAILORMEN, INC., a Florida corporation,<br><br>    Defendant. | No. 1:25-cv-10146 |

### DECLARATION OF LAUREN BUYSSE

I, Lauren Buysse, declare as follows:

1. I am over the age of eighteen years, am under no disability and am competent to testify to the matters set forth herein. Except as otherwise stated, all facts set forth in this declaration are based upon my personal knowledge and/or my review of documents. If called as a witness in this case, I could and would testify competently to the facts set forth in this declaration.

2. I submit this declaration in support of the *Plaintiff's Motion for Entry of an Order (I) Appointing Receiver Over Defendant and its Assets; (II) Issuing Stay; and (III) Granting Related Relief*, dated December 8, 2025 (the "Motion"). Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

3. I am a Managing Director of Special Accounts at BMO Bank N.A., formerly known as BMO Harris Bank N.A. ("BMO" or "Plaintiff"), a national banking association with its main office in Chicago, Illinois.

  **A.** **The parties, their relationship and their businesses**

4. BMO is the administrative agent (in such capacity, as successor and assign of BBVA USA, formerly known as Compass Bank, the "Agent") to the lenders from time to time

party to that certain *Sixth Amended and Restated Credit Agreement*, dated as of September 3, 2020 (as amended, restated, extended, supplemented or otherwise modified from time to time, the "Credit Agreement", and such lenders, the "Lenders").

5. Pursuant to the Credit Agreement and the other Loan Documents, Agent and the Lenders have made certain financing commitments to Sailormen, Inc. ("Sailormen" or the "Defendant") in exchange for Defendant's agreement to meet its Obligations under the Credit Agreement and the other Loan Documents.

6. Defendant is a Florida corporation that operates Popeyes Louisiana Kitchen restaurants pursuant to franchise agreements with Popeyes Louisiana Kitchen, Inc. (the "Franchisor"). As of February 2025, Sailormen employed over 4,000 people.

7. I have primary responsibility at BMO for managing Agent's relationship with Defendant and am the senior representative of the Agent team in its dealings with the Lenders.

**B.    The Credit Agreement and the Loans**

8. The Credit Agreement originally provided Defendant with Loans in the aggregate amount of $113,500,000, consisting of Term Loans, Revolving Loans and Development Loans, of which at least $112,363,525.64 in principal remains unpaid as of November 28, 2025.

9. Defendant has further incurred charges including interest, expenses, fees and costs, including, but not limited to, attorney's fees and costs, which continue to accrue as of the date hereof. Agent therefore seeks compensatory damages in an amount not less than $129,982,639.

**C.    The Collateral**

10. Agent has a fully perfected security interest in the Collateral (collectively, the "Collateral Liens").

**D.     Defendant's Failure to Resolve Events of Default**

11.     Defendant has committed numerous Events of Default under the Credit Agreement that are continuing as of the date hereof, including, among other things, by failing to pay the Lenders any principal and interest due and owing since November 2024, which amount now totals approximately $126,960,098 (as of November 28, 2025), as well all fees and other amounts due to the Lenders.

12.     For over a year, my team and I have devoted a great deal of time and effort negotiating with Defendant and Defendant's equity sponsor and controlling shareholder, CapitalSpring ("CapitalSpring"), in an attempt to implement a comprehensive restructuring process for Defendant and resume payments to the Lenders. In furtherance of that process, in early 2025 my team and I engaged Katten Muchin Rosenman LLP ("Katten") as restructuring counsel for this matter, and Katten in turn engaged G2 Capital Advisors, LLC ("G2") as financial advisor in early February 2025. Similarly, Defendant engaged Capital Insight ("Capital Insight") as its financial advisor and investment banker in January 2025.

13.     From September 2024 until January 2025, Agent and the Lenders attempted to reach a negotiated agreement with Defendant and CapitalSpring, whereby CapitalSpring would make an equity investment, and the terms of the Credit Agreement would be amended to resolve then-ongoing Events of Default, address Defendant's liquidity issues and provide for payment of principal and interest. CapitalSpring communicated its unwillingness to reach an agreement to the Agent in January 2025.

14.     From February-June 2025, Agent and the Lenders extensively negotiated terms of a comprehensive capital-structure restructuring with Defendant and CapitalSpring, which led to an agreement in principle among the parties, subject to discreet open issues. On or about June 19,

2025, representatives of Defendant informed representatives from G2 that they and CapitalSpring were unwilling to proceed with the negotiated restructuring.

15. During late summer 2025, Agent and the Lenders implored Defendant to sell certain assets located in and around Jacksonville, Florida (the "Jacksonville Market"). Agent and the Lenders offered to forbear on the Loans if Defendant would agree to appoint an independent director with authority over the Jacksonville Market sale process and to reached certain milestones in connection with a Jacksonville Market sale. Defendant declined to enter into a forbearance agreement, instead opting to pursue a Jacksonville Market sale while remaining in default.

16. In pursuit of the Jacksonville Market sale, Defendant, with support from the Lenders, directed Capital Insight to act as investment banker and market the Jacksonville Market assets. Capital Insight contacted 24 potential buyers and solicited letters of intent. Capital Insight's robust efforts resulted in only one offer, which Defendant and CapitalSpring declined. To date, Defendant and its representatives have declined all workable solutions presented by Agent and the Lenders to resolve Defendant's ongoing payment failures and breaches under the Credit Agreement.

17. Agent and Defendant are now at a critical impasse regarding funding of Defendant's operations and repayment of the Obligations.

**E.   Appointment of receiver**

18. Defendant has failed to address its longstanding Events of Default and has no viable plan to remedy them. Defendant's cash position is now precariously low, and the company functions by not paying its Obligations and deferring rent. For example, in September 2025, Defendant's chief financial officer, Christine Borrack, advised me that, given the company's

relatively low cash balance, it would be unable to pay the Lenders' professional fees for the remainder of the year.

19. In consultation with the Lenders, Agent and its professional advisors have determined that appointment of a receiver over the Defendant and its assets is the only way for the Lenders to maximally monetize their collateral and maintain Defendant's business as a going concern with a strong and healthy relationship with the Franchisor and the company's other economic stakeholders and commercial partners.

20. My professional advisors, my staff and I have determined that, unless a receiver is immediately appointed over Defendant, the Lenders would have little choice but to exercise more extreme remedies that would almost certainly result in the total liquidation of Defendant and its assets and the termination of all of its employees.

21. With a receiver appointed, the Lenders are willing to fund up to $5,500,000, in accordance with an agreed upon budget, to facilitate a sale of Defendant's assets and fund projected operational shortfalls during the receivership.

22. Following an extensive vetting process involving several candidates, Agent and the Lenders have chosen to nominate Daniel F. Dooley, a seasoned restructuring professional with specific experience with numerous franchised restaurants and with the Franchisor's parent company in particular, as well as having served as federal receiver and state court receiver. Mr. Dooley's primary objective would be to sell the business to better capitalized owners, who would pay down the Obligations and stabilize the company's relationship with the Franchisor for the long term.

23. Mr. Dooley has over 27 years of restructuring experience at MorrisAnderson & Associates, Ltd. ("MorrisAnderson"), and an additional 16 years of corporate experience in

financial management and executive roles. Mr. Dooley is a principal and chief executive officer of MorrisAnderson, owned by JS Held LLC, which is a boutique consulting firm solely focused on assisting companies in financial distress and their creditors.

24. Mr. Dooley has served as the court appointed receiver, in both federal and state court, for approximately nine financially distressed companies, and has further been involved in over 10 liquidation scenarios, both in- and out-of-court and including receiverships and chapter 11 cases. Mr. Dooley is also active in providing financial advisory services to financially distressed companies and has served on several boards of directors for distressed companies, including serving as an independent director.

**F.     Receivership Stay**

25. Defendant operates over 130 restaurants with locations in Florida and Georgia and has numerous landlords and other creditors. Given the possibility of duplicative litigation by landlords and other creditors to collect on their claims, my staff, my professional advisors and I believe that a stay, issued by this Court, will allow the receiver to maintain the status quo and ensure that Defendant's business continues to operate while paying the Obligations.

**G.     Documents**

26. A true and correct copy of the Credit Agreement is attached to the Complaint as **Exhibit 1**.

27. A true and correct copy of the Agency Transfer Agreement is attached to the Complaint as **Exhibit 2**.

28. A true and correct copy of the Seventh Amendment is attached to the Complaint as **Exhibit 3**.

29. A true and correct copy of the Security Agreement is attached to the Complaint as **Exhibit 4**.

30. A true and correct copy of the *Reservation of Rights Letter*, dated November 28, 2023, is attached to the Complaint as **Exhibit 5**.

31. A true and correct copy of the *Reservation of Rights Letter*, dated January 18, 2024, is attached to the Complaint as **Exhibit 6**.

32. A true and correct copy of the *Reservation of Rights Letter*, dated February 7, 2024, is attached to the Complaint as **Exhibit 7**.

33. A true and correct copy of the *Reservation of Rights Letter*, dated November 26, 2024, is attached to the Complaint as **Exhibit 8**.

34. A true and correct copy of the *Reservation of Rights Letter*, dated December 18, 2024, is attached to the Complaint as **Exhibit 9**.

35. A true and correct copy of the *Reservation of Rights Letter*, dated February 3, 2025, is attached to the Complaint as **Exhibit 10**.

36. A true and correct copy of the *Reservation of Rights Letter*, dated August 8, 2025, is attached to the Complaint as **Exhibit 11**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 8, 2025
in Chicago, Illinois

_Lauren Buysse_
Lauren Buysse