UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
BMO BANK N.A., a national banking association, as Administrative Agent,

                         Plaintiff,

-against-

SAILORMEN, INC., a Florida Corporation,

                         Defendant.
------------------------------------------------------X

Case No. 1:25-cv-10146

# DECLARATION OF BRETT BISHOV IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) APPOINTING RECEIVER OVER DEFENDANT AND ITS ASSETS; (II) ISSUING STAY; AND (III0 GRANTING RELATED RELIEF

**BRETT BISHOV**, being duly deposed, under penalty of perjury, hereby declares as follows:

1.      I am the Managing Partner of Capital Insight LLC ("CI"), which, at relevant times, was engaged as the financial advisor to Defendant, Sailormen, Inc. ("Defendant"). In such capacity, I hereby submit this Declaration in support of Defendant's opposition ("Opposition") to the expedited motion ("Motion") of Plaintiff BMO Bank N.A., in its capacity as administrative agent to the Lenders[1] under the Credit Agreement, seeking, on an expedited basis, the immediate appointment of its proposed receiver to assume control over Defendant's business and operations, a stay over all actions against the Defendant, and related relief.

**I.**      **Engagement as Financial Advisor of Defendant.**

2.      I have extensive experience as a financial advisor, working with distressed companies including in the restaurant industry.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

3. I am the Founder and Managing Partner of CI, a middle-market investment bank, which began in 2004. CI provides various financial advisory services with a domain expertise primarily in the restaurant segment as well as other multi-unit branded retail focused on M&A, corporate finance, senior, sub and equity financing and distressed debtor and creditor representation. I have developed and maintained many meaningful long-standing institutional and entrepreneurial client and capital market relationships where I have been responsible for the origination, underwriting, structuring, executing and closing over $15 billion of transactions as principal lender and financial advisor.

4. Prior to founding CI, I was the first employee (1998) and Vice President with American Commercial Capital (ACC), a commercial finance company and investment bank that focused on multi-unit branded retail with a focus on restaurants and gas station/convenience stores. I was intimately involved with establishing the underwriting policies and procedures at inception and later ran the origination group. I was an integral part in the growth, success and sale of ACC, which was acquired by Wells Fargo & Company in 2001 and currently doing business as Wells Fargo Restaurant Finance.

5. On January 24, 2025, CI was engaged by Defendant to act as an exclusive financial advisor to the company with respect to (i) certain restructuring activities regarding the company's balance sheet with respect, among other things (a) negotiations with the Lenders with respect to their senior credit facility, (b) negotiations with landlords and restructuring of leases, and (c) negotiations amount various material creditor constituents, which may include Popeyes Louisiana Kitchen, Inc. ("Franchisor"), and (ii) possible sale of some or all of the assets or equity related to its operating Popeyes franchise restaurants.

6. During the course of this engagement, I was actively involved in two main activities: (i) negotiations with the Lenders to restructure the debt obligations and (ii) the marketing and potential sale of certain restaurant assets in the Jacksonville Florida DMA.

**II.     Restructuring Services and Proposed Jacksonville Sale**

7. Beginning in January 2025, I worked with Defendant in its efforts to restructure the debt obligations to the Lenders and their advisor G2 Capital Advisors, LLC ("G2") under the Credit Agreement.

8. The parties engaged in substantial negotiations from January through June 2025, with the parties being in continuous contact and discussions during this period. As a result, the parties exchanged at least six (6) formal restructuring proposals, with the last proposal being sent on or about May 14, 2025.

9. While the parties believed that they were close to reaching a tentative agreement on terms, any proposal would have required the support of the Franchisor. Unfortunately, the plan proposed in May 2025 ultimately would not have received the required Franchisor approval. One reason was that the performance of business had declined from what was originally anticipated or modeled, and as a result the restructuring proposed could not be achieved.

10. While Plaintiff has characterized the failed negotiations as a result of actions taken by Defendant and its equity holders, this is not accurate. The negotiations continued until it was determined that the restructuring proposal would not be agreeable to the Franchisor, and thus the parties together determined to pivot to a new strategy to reach the goal of restructuring the debt obligations.

11. With the agreement of the Lenders, Defendant pivoted to the marketing and sale of 32 franchise restaurants in the Jacksonville Florida region. It was intended that the sale

would improve portfolio profitability, provide additional capital to Defendant and relieve the Defendant of material capital expense requirements mandated by the Franchisor, which would then be incorporated into a restructuring proposal sufficient to obtain Franchisor consent. In furtherance of same, Defendant appointed Ralph Strayhorn as an independent director to assist with the sale process.

12. With continued coordination with the Lenders, their professionals, Franchisor, and Defendant, through CI, engaged in a robust marketing effort for the sale, identifying more than 57 potential interested parties. CI provide the Lenders and their professionals with a directional divestiture timeline, requiring 120 days to complete any proposed sale, and continuously updated spreadsheets setting forth the actions and results of the process around the proposed sale. The Lenders were and remained intimately involved throughout this process.

13. Ultimately, only one potential purchaser emerged from this process, all other possible interested parties declined to move forward due to the under performance of the assets. CI engaged in significant discussions and negotiations with the proposed purchaser, which resulted in several proposed letters of intent. Through October 2025, the proposed purchaser issued at least four separate letters of intent (9/5/2025, 9/16/2025, 10/1/2025, and 10/15/2025) and materially changed the deal on numerous occasions, including price, restaurant locations, closing demands, and consideration. For example, at one point the proposed purchaser demanded to purchase 75 locations (despite the fact that the deal was only for 32 specific locations), added a right of first refusal for any further sales by Defendant, included atypical non-compete provisions, and closing requirements which cost would have likely exceeded the purchase price. As is clear, the offers made by the proposed purchaser were deemed to not be viable, would not have provide any of the capital sought under the strategy, and not in the best

interest of Defendant or any of the stakeholders including the Lenders or Franchisor. Nonetheless, the Lenders were intimately involved in this process. The net proceeds from a possible sale would have resulted in creating a net cost to the Defendant due to legal, professional and repayment of allocable current liabilities making it a deficit to the Defendant economically.

14. Since the termination of the Jacksonville sale transaction, CI has continued to provide advisory services to Defendant. Defendant has discussed the potential note sale with the Lenders, but the Lenders have to date refused to provide any required pricing for such a sale. CI and Defendant's management continue to pursue potential sale of the note in satisfaction of the obligations.

15. In its efforts to artificially enhance their Motion, Plaintiff has attributed two quotes from me in an effort to establish the insolvency of Defendant. Both of these quotes, which were part of more detailed negotiations, are taken out of context. The statement attributed to me from an April 10, 2025 text was in discussion in the negotiations regarding a possible "discounted payoff" (or "DPO") of the obligation. By its very term, a "discounted payoff" would only be entered into by a creditor party if it believed that the value of the business was less than the outstanding debt, i.e. that it was not at par. This was part of a much longer text in the negotiations where the proposed restructuring offer was deemed not viable for Defendant and thus resulted in a counterproposal. The October verbal quote related to a much more complex discussion. To my recollection, the context surrounded a discussion on whether the company was performing relative to pro forma estimates. In both cases, neither of these statements involved the issue of insolvency of the company.

16.	It is my understanding that the Lenders received bi-weekly cash flow statements from Defendant and periodic financial reporting including store level and corporate profit and loss statements, cash flow, balance sheets, liquidity compliance and EBITDA compliance.  The fact that they base their arguments of insolvency on two quotes, taken out of context as part of a more significant negotiation, is unusual at best.

17.	The foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 7, 2026

_____
Brett Bishov