UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BMO BANK N.A., a national banking        Case No. 1:25-cv-10146
association, as Administrative Agent,

                           Plaintiff,

   -against-

SAILORMEN, INC., a Florida Corporation,

                           Defendant.
-------------------------------------------------------X

**DECLARATION OF DEFENDANT'S INDEPENDENT DIRECTOR RALPH STRAYHORN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) APPOINTING RECEIVER OVER DEFENDANT AND ITS ASSETS; (II) ISSUING STAY; AND (III0 GRANTING RELATED RELIEF**

**RALPH N. STRAYHORN**, being duly deposed, under penalty of perjury, hereby declares as follows:

1. I am the Independent Director of Defendant, Sailormen, Inc. ("Defendant"), and in such capacity I hereby submit this Declaration in support of Defendant's opposition ("Opposition") to the expedited motion ("Motion") of Plaintiff BMO Bank N.A., in its capacity as administrative agent to the Lenders[1] under the Credit Agreement, seeking, on an expedited basis, the immediate appointment of its proposed receiver to assume control over Defendant's business and operations, a stay over all actions against the Defendant, and related relief.

2. For the reasons more fully set forth herein and in Defendant's Memorandum of Law in Opposition (the "Opposition"), it is submitted that the Motion must be denied in all respects. To the extent the Court is inclined to grant the "extraordinary remedy" of appointing a receiver over the property of the Debtors, it is submitted that any such order of the Court limit

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

the scope of the receiver's rights, duties and authority <u>solely</u> to the extent necessary to protect the Plaintiff's interests in the property, while maintaining the rights of the Defendant and its equity interest holders.

**I.       Engagement as Independent Director of Defendant.**

3.       I have extensive experience as a chief executive officer, board member, corporate governance expert and regulatory crisis advisor.   Since 2004 I have served on seven financial institution boards of directors.   In addition, I am a founder, Chairman and CEO of New Republic Partners, Inc., a bank holding company and New Republic Bank.   I was the co-founder of New Republic Partners, a scaled SEC-registered RIA with AUM of $2.5 billion.

4.       Since 2009, I have served as Managing Partner of Cape Point Advisory Partners, LLC ("Cape Point Advisors"), a corporate governance, regulatory and crisis management advisory firm which has been engaged by numerous companies under regulatory, management and financial distress.  A copy of my C.V. is attached hereto as **<u>Exhibit A</u>**.

5.       Among my engagements at Cape Point Advisors, and significant to the current situation, I was appointed to the Board of Managers of Premier Kings, Inc. and its affiliates and subsidiaries, to supervise the restructuring and sale of the companies' 170 Burger King franchise restaurants owned and operated by the companies.

6.       As part of Defendant's ongoing efforts to meet the challenging economic and business environment, and to work cooperatively with the Lenders, I was engaged, through Cape Point Advisors, first in a consultant advisory role in or about June 4, 2025.  A copy of the Board Advisory Services Agreement is attached hereto as **<u>Exhibit B</u>**.  In my capacity as a consultant, I was engaged to provide special advisory services, including loan workout/restructuring with Defendant's lenders, creditors, and franchisor.

7. Upon Written Consent of the Board of Directors of Interfoods of America, Inc., dated effective as of August 26, 2025, I was appointed to serve as an independent director of Defendant. A copy of the Written Consent is attached as **Exhibit C**. Prior to these engagements, I had no prior connection with Defendant, or any of its members, managers or officers.

8. At the outset of my engagement, I was involved in then-ongoing negotiations and efforts by Defendant and its financial advisor, Capital Insight LLC ("CI") to reach an agreement for the restructuring of its obligations under the Loan Documents with the Lenders.

9. Once the restructuring strategies shifted to a sale-first plan, I transitioned from consultant to Independent Director in furtherance of Defendant's and CI's efforts, in coordination with the Lenders and their professionals, to market and sell 32 franchise restaurants in Jacksonville Florida region as part of their restructuring strategy. Unfortunately, after significant negotiations, it was determined that no viable purchaser or other selling option became available at that time.

10. Since that time, I have been working, among other things, with Defendant and its advisors to structure a potential sale of the notes in satisfaction thereof, or otherwise restructure the debt obligations.

II. **The Company and its Business Operations**

11. Defendant is the owner and operator of 136 Popeyes Louisiana Kitchen franchise restaurants located in Florida and Georgia. Defendant actively employs more than 2900 employees.

12. Defendant was incorporated in Florida on January 27, 1984. Defendant is a wholly owned subsidiary of Interfoods of America, Inc.

13. Defendant operates pursuant to its By-Laws (as may be amended and restated). A copy of the By-Laws is attached as **Exhibit D**. Pursuant to the terms of the By-Laws, the business of the company shall be managed and its corporate powers exercised by a Board of Directors. The Board of Directors appoints the officers of the company, who have the general and active management of the company's business and affairs, subject to the directions of the Board of Directors.

14. Defendant operates the franchise restaurants pursuant to the terms of certain franchise agreements (collectively, the "Franchise Agreements"; each a "Franchise Agreement") with Popeyes Louisiana Kitchen, Inc. ("Franchisor"). There is a separate Franchise Agreement entered into for each restaurant location. The Franchise Agreements are for a term of Twenty (20) Years), with a Ten (10) Year Renewal Term.

15. According to the terms, the Franchise Agreements are personal to Defendant and entered into in reliance on Defendant's business skill and financial capacity. Further, the Franchise Agreements and the rights thereunder are not assignable or transferable by Defendant, except with express consent of Franchisor.

16. Under the terms thereof, Defendant shall be deemed to be in default under the Franchise Agreements, and all rights granted thereunder shall automatically terminate without notice to Defendant, if Defendant shall, *inter alia*, (i) become insolvent or make a general assignment for the benefit of creditors; (ii) if a petition in bankruptcy is filed by Franchisee or such petition is filed against Franchisee and not opposed by Franchisee; or (iii) if Franchisee is adjudicated bankrupt or insolvent; or (iv) if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction.

17.	Among other remedies, upon the occurrence of a termination of the Franchise Agreement, Defendant shall immediately cease to operate the Franchised restaurants as a Popeyes Restaurant, and shall not thereafter, directly or indirectly, represent to the public that the restaurant is a Popeyes Restaurant.

18.	To date, to my knowledge, no termination has been noticed or occurred under the Franchise Agreements, and Defendant continues to operate the Popeyes franchise restaurants and remains in good standing thereunder.

19.	During the course of the negotiations with the Lenders, it is understood that Defendant and its management team had the support of the Franchisor.

**III.	Loan Documents, Ongoing Discussions with Lenders, and Sales Transaction.**

20.	I refer the Court to the Loan Document and the related documents as set forth in full in the Motion for their terms and conditions, which are not in dispute.

21.	As a result of certain challenging economic and business conditions, certain Events of Default have occurred under the Loan Agreements.   Since such time, Defendant has been in continued and ongoing discussions and negotiations with the Lenders regarding the business operations.   To this point, it is my understanding that the Lenders have issued multiple reservation of rights letters, seeking to preserve their rights all while continuing to work with Defendant and its professionals towards a solution on these issues.

22.	Throughout the spring of 2025, it is my understanding that Defendant and Plaintiff undertook negotiations for the restructuring of Defendant's indebtedness.  I refer the Court to the Declaration of Brett Bishov, Managing Director of CI, which details the substantial negotiations between Defendant and the Lenders.  Ultimately the parties were unable to reach an agreement on the restructuring terms which would be agreeable to the Franchisor, thus causing

Defendant and the Lenders to pivot to an alternative plan, namely the sale of the Jacksonville region restaurants so as to provide necessary capital to complete the restructuring of the obligations under the Credit Agreement.

23. Thereafter, in August 2025, Defendant and CI, with intimate involvement of the Lenders and its own investment banker, actively marketed a potential sale of Defendant's 32 Popeyes franchise restaurants in the Jacksonville Florida market.[2] Marketing materials were prepared and a robust marketing effort involving over 57 potential purchasers was undertaken. These restaurants generated approximately $43.25 million in sales and presented a unique opportunity to acquire scale/economies of scale within a premier top tier QSR brand in one of the most geographically desirable markets within the United States.

24. Despite the marketing efforts, only one potential purchaser emerged. Defendant engaged with the proposed purchasers from September through October 15, 2025. Ultimately, the offers made by the proposed purchaser were deemed to not be viable, would not have provided sufficient capital sought under the restructuring strategy, and were not in the best interest of Defendant or any of the stakeholders including the Lenders or Franchisor.

**IV.  Appointment of Receiver is Not Warranted.**

25. Despite the ongoing negotiations between Defendant and the Lenders, the Lenders have determined to submit this motion for appointment of a receiver, referencing a provision under to Section 11 of the Security Agreement. Notwithstanding, as set forth in Defendant's Opposition it is submitted that the appointment of a receiver is not warranted in this matter, at this time. An analysis of the facts and circumstances make clear that Plaintiff has

---

[2] The restaurants were located in Jacksonville, FL metropolitan area and surrounding counties, inclusive of Starke, Orange Park, Lake City, Palatka, Neptune Beach, Middleburg, East Palatka, Macclenny, Callahan, and Keystone Heights, Florida; and Brunswick and Waycross, Georgia.

failed to make the requisite showing to meet its burden of establishing that such a drastic remedy, i.e. one that strips Defendant, its management, its Board of Directors, and its stakeholders of all control and decision making for their enterprise, is necessary to protect its collateral.  It is submitted that the facts warrant the denial of any such relief.

26.     Plaintiff and Defendant have been in steady negotiations regarding the outstanding obligations under the Credit Agreement for a significant period of time, resulting in a series of amendments to the obligations under the Loan Documents.  While the parties are still negotiating possible terms to restructure the obligations, Defendant continues to operate its significant business enterprise.

27.     While the Motion outlines issues regarding certain purported Events of Default under the Credit Agreement, there are no facts to provide evidence of any substantial diminution of value of Plaintiff's collateral.  To the contrary, the following facts are instructive for the Court:

- Defendant's significant business enterprise remains operational.
- All of Defendant's restaurants remain open and operating.
- Defendant has been able to meet, and will continue to meet, its payroll obligations to date for its 2900 employees.
- The Franchisor has not taken any action against Defendant under the Franchise Agreements which would operate to terminate them.  Defendant's restaurants remain in good standing under the Franchise Agreements.

28.     Any allegation that Defendant is in immediate danger of running out of money is speculative, at best.  The Motion fails to provide the Court with any financial statements or information necessary for it to consider Defendant's financial condition.  Instead, Plaintiff relies upon certain informal and random verbal statements and emails.  In fact, the failure to provide any financial information or data is telling.  Lenders receive bi-weekly cash flow statements

from Defendant and periodic financial reporting including store level and corporate profit and loss statements, cash flow, balance sheets, liquidity compliance and EBITDA compliance.

29.     The Motion also relies upon certain deferrals of rent with Defendant's landlords. However, Defendant has actually made catch-up payments with respect to such deferred rent payments.

30.     Defendant has taken significant steps in its effort to restructure the business and preserve value for the stakeholders.  These steps include retaining CI as financial advisor, retaining me as an Independent Director, marketing the sale of assets to provide capital to the business and in furtherance of a restructuring of the debt that can meet the requirements under the Franchise Agreement.

31.     Importantly, the appointment of a receiver will not preserve or create any value other than actions already taken by Defendant, but in fact could have the opposite effect.   The appointment of a receive is a default under the Franchise Agreement, which automatically terminates the Franchise Agreements and all rights thereunder, including the right to continued operation of Defendant's franchise restaurants.   We are not aware of any agreement between the Lenders and the Franchisor under which the Franchisor agrees to waive this default and termination.   The result will be, without any other interceding actions, the closure of all 136 franchise restaurants, and the termination of 2900 employees, with possible immediate effect.

32.     As such, the allegations relied upon in the Motion to somehow show harm to the collateral or injury to Plaintiff are not established.  Certainly, they do not warrant the Court's exercise of its discretion to grant such extraordinary relief.

**V.      Any Appointment of Receiver should limit authority to preserve any collateral.**

33. To the extent the Court finds that the grant of such the drastic remedy of appointing a receiver is appropriate and vitally necessary, Defendant respectfully requests that the Court limit the scope of any court-appointed receiver's rights, duties and authority as may be <u>solely</u> necessary to adequately preserve Plaintiff's collateral under the Loan Agreements.

34. In appointing a receiver, it is requested that any order permit Defendant, its Board of Directors, and its equity interests holders to preserve and maintain all existing rights under the By-Laws, including to seek other actions or remedies in the best interest of the company, its employees and stakeholders, which may include (i) making a determination to seek bankruptcy protection, (ii) providing for a proposed restructuring of the business operations, (iii) restructuring or sale of the notes in satisfaction of the outstanding obligations to the Lenders, or (iv) marketing and effectuating a sale of all or a part of the business, all in line with any obligations under the Credit Agreement and the terms of the Franchise Agreements.

35. The Motion seeks an order from this Court whereby Defendant would relinquish full control over Defendant's business operations, and effectively all decisions regarding this significant enterprise, to a receiver hand-picked by Plaintiff.  Yet, the applicable provision of the Security Agreement relied upon in the Motion for providing for the appointment of a receiver does not provide for, and Defendant did not consent to, an appointment which would provide unfettered control to a proposed receiver, obviate the rights of Defendant's Board of Directors, shareholders or management, or modify the provisions of Defendant's organizational and operating agreements.

36. Section 11 of the Security Agreement generally provides for the appointment of a receiver over the "properties and assets of" Defendant.  However, it was not intended to cede all control over the enterprise, or the significant decisions that the company may consider, to the

receiver. In fact, any consent to an appointment of a receiver under the Security Agreement is limited in time, namely "upon the occurrence and during the continuation of an Event of Default." To the extent the Event of Default is cured, the receivership is intended to terminate.

37. Importantly, Plaintiff does not establish the need for such unfettered control by a receiver. All actions to be taken by a receiver are already in the works by Defendant, including retention of CI as financial advisor, appointment of an independent director, marketing efforts for sale of certain restaurant locations, and negotiations for restructuring of the debt or sale of the notes in satisfaction thereof.

38. Defendant does not doubt the proposed receiver's qualifications, however there is no evidence that any such appointment warrants or other necessitates the ceding of all control, rights and authority over all aspects of Defendant's operations and business decisions, including future actions re sale or potential bankruptcy filings. The Motion does not provide any details over what duties and authority the receiver should have if so appointed.

39. As such, notwithstanding any determination for the appointment of a receiver, it is submitted any order of the Court appointing a receiver should specify that Defendant's Board of Directors and equity interest holders retain all right sunder the By Laws, including without limitation, making a determination to seek bankruptcy protection, providing for a proposed restructuring of the business operations, and/or marketing and effectuating a sale of all or a part of the business, in line with any obligations under the Loan Documents and the terms of the respective franchise agreements with Franchisor.

40. The foregoing is true and correct to the best of my knowledge.

Dated: January 7, 2026

<u>*/s/Ralph N. Strayhorn*</u>
Ralph N. Strayhorn.